STATE EX REL. WISCONSIN ALLIED TRUCK OWNERS ASSO-
CIATION and another, Plaintiffs, vs. PUBLIC SERVICE
COMMISSION and another, Defendants.

*April 8—April 20, 1932.*

The cause was submitted for the plaintiffs on the brief of *Stephens, Sletteland & Sutherland* of Madison, and for the defendants on that of *John W. Reynolds,* attorney general, *Benjamin Poss* of Milwaukee, special counsel, and *David E. Lilienthal* of Madison of counsel.

A brief was also filed by *C. R. Dineen* and *Walter Drew,* both of Milwaukee, as *amici curiæ.*

The following opinion was filed April 20, 1932:

PER CURIAM. The act challenged by this action, known as the Truck Ton Mile Tax Law, is held constitutional. The prayer of the petitioners for a permanent injunction is denied. The construction placed upon the act by the Public Service Commission is approved in principle, except as to vehicles not transporting freight. An opinion will be filed in due course.

The following opinion was filed May 10, 1932:

OWEN, J. The law under scrutiny in this action is ch. 454, Laws of 1931, imposing a ton-mile tax upon certain trucks used upon the highways of this state. Ch. 194 of the Stat-

utes originated in ch. 395, Laws of 1927, and imposed certain regulations and taxes upon motor vehicles when used as common carriers. Said ch. 194 of the Statutes is termed "Automobile as a Common Carrier." That chapter, in connection with sec. 76.54 of the Statutes, imposed upon auto transportation companies, defined generally as persons, operating motor vehicles as common carriers, whether for persons or freight, a certain ton-mile tax.

The general purpose of ch. 454, Laws of 1931, was to subject heavy trucks used upon the highways of the state to a similar tax. This was accomplished by adding to ch. 194 what is known as sec. 194.16. That section created a new class operating motor vehicles upon the highways which it designated as "Motor Vehicle Hauling Company." It defined motor vehicle hauling company as—

"Every person, firm or corporation or their lessees, trustees or receivers, owning, controlling, managing or operating any motor vehicle, trailer or semi-trailer upon a public highway in this state, including operations between any points within this state and/or through the state, for the purpose of moving, hauling or transporting goods, wares, merchandise or other property for hire or consideration of any kind, under oral, written, express or implied contract, or without hire or consideration or for or as incidental to the business of the owner or operator, excepting the following:

"(a) Motor vehicles in single units, or in combinations with other motor vehicles or trailers or semi-trailers where the aggregate weight of such units or combinations does not exceed three tons;

"(b) Motor vehicles, trailers or semi-trailers owned or operated by the state or any political subdivision thereof;

"(c) Motor vehicles, trailers or semi-trailers used or operated exclusively in transporting or delivering dairy or other farm products between the point of production and the primary market;

"(d) Motor vehicles, trailers and semi-trailers operated within the limits of an incorporated village or city;

"(e) Auto transportation companies as defined in subsection (6) of section 194.01."

The section further provides that no motor vehicle subject to the section shall be operated on the highways without first obtaining a permit therefor from the Public Service Commission for which a fee of $5 is prescribed. Sec. 76.54, Stats., the section under which the ton-mile tax is imposed, is amended, bringing motor vehicle hauling companies under its provisions and subjecting them to the duty of keeping the same daily records, making the same reports, and paying the same taxes required of auto transportation companies.

This law meets with the same reception that has been accorded to every other attempt made by the legislature to require those using the highways of the state to pay some just proportion of the expense incident to their construction and maintenance. Though it is now thoroughly established and generally recognized that the state may exact compensation from those who use its highways (*Hendrick v. Maryland,* 235 U. S. 610, 35 Sup. Ct. 140; *Kane v. New Jersey,* 242 U. S. 160, 37 Sup. Ct. 30; *Clark v. Poor,* 274 U. S. 554, 47 Sup. Ct. 702; *Sprout v. South Bend,* 277 U. S. 163, 48 Sup. Ct. 502; *Interstate Transit Inc. v. Lindsey,* 283 U. S. 183, 51 Sup. Ct. 380), we have here much the same attack upon this law that was made upon prior attempts of the legislature in this direction. *State ex rel. Transportation Asso. v. Zimmerman,* 181 Wis. 552, 196 N. W. 848; *State ex rel. Northern Transp. Co. v. Railroad Comm.* 196 Wis. 410, 220 N. W. 390; *Interstate Trucking Co. v. Dammann,* 208 Wis. 116, 241 N. W. 625. The law is challenged upon the ground that it is so ambiguous and uncertain as to be impossible of understanding so that a person may know whether he is violating the law; that it denies the equal protection of the laws because of unjust and arbitrary classification; and because it provides for unjust and unreasonable exemptions. Prompted by the zeal of counsel, the law has been raked with a fine-tooth comb, resulting in the presenta-

tion of trivial and unsubstantial points, which too often results from the excessive zeal of counsel and which tends to confusion rather than clarification in both presentation and consideration of the case. To take up seriatim and in detail all of the points raised by counsel who assail the law (and many of them seem to be merely "raised") would extend this opinion to an inordinate length in proportion to the contribution which would result to the jurisprudence of the state. Our treatment of the statute will be along somewhat broader lines than those followed in the brief of counsel, but we believe that our discussion along these lines will unerringly indicate to the studious mind the response of the court to many "points raised" which will not be dignified by separate consideration.

In the first place, there can be no doubt that the tax imposed is for the exact purpose declared by the law, namely, a compensation for the use of the public highways and their maintenance and repair. Such a charge may be made by the state when it is clear that the charge imposed is for the use of the highways. While this purpose on the part of the state may appear in many different ways, it can appear with no greater certainty than when the tax imposed is in the nature of a ton-mile tax, which is a tax imposed in exact proportion to the use made of the highways. The fact that the tax here imposed is a ton-mile tax is the most indubitable evidence that the tax imposed is for the legitimate purpose of compensating the state for the use of its highways. When such is the case, it matters not what the state does with the money it receives. When the purpose of the tax is not so clear, then an inquiry as to what the state does with the proceeds of the tax may throw some light upon the purpose of the tax, but no such inquiry is essential where the tax imposed is a ton-mile tax.

This law, however, exacts a charge separate and apart from the ton-mile tax. It exacts a permit fee from all

those who come under the provisions of the act. It is said that if this fee is a charge made for the purpose of covering the expense incident to an enforcement of the law, then it cannot be sustained, because it is more than is necessary for that purpose.

By sub. (5) of sec. 20.51, Stats. (added by ch. 5, Laws of 1931, Sp. Sess.), the money thus raised, together with the fees collected by virtue of sec. 194.11, being fees paid by auto transportation companies for obtaining a certificate from the Public Service Commission, are appropriated to the Public Service Commission to carry out the provisions of ch. 194. It is contended that the moneys arising from the permit fee of $5 paid by auto transportation companies will greatly exceed the cost of enforcing the law, and that by this appropriation the money is appropriated not only for the purpose of enforcing this law but for the purpose of enforcing all of the provisions of ch. 194, many of which do not relate to motor vehicle hauling companies.

It is apparent that the enforcement of this law will entail considerable expense if it is efficiently enforced. It will require police duty in checking up all trucks used upon the highways, the extent of which may be limited only by the amount of money available for the purpose. There is no way for the court to determine whether the $5 permit fee is or is not an unreasonable appropriation for that purpose. But however that may be, the legislature evidently did not consider it sufficient, because, by sub. (6) of sec. 20.51, it in addition appropriated annually "such sums as may be necessary for the administration of sections 76.54 and 194.16." Our conclusion that the permit fee of $5 can be justified on the ground that it is a reasonable charge made for the purpose of covering the expense of administering the law renders it unnecessary for us to consider whether it may be justified as proper compensation for the use of the highways in addition to the ton-mile tax imposed.

The law, as is usual with reference to such laws, gives rise to certain classifications, aside from the exemptions introduced into the law, many of which classifications are assailed on the ground that they are arbitrary and discriminatory. It is suggested in the briefs that the law imposes an unjust burden upon and discriminates against interstate commerce. This suggestion, however, is not accompanied by any attempt to demonstrate that the law does, or tends to, discriminate against interstate commerce or to impose upon interstate commerce any burden that is not equally imposed upon intrastate commerce.

The law imposes upon the operators of motor vehicle hauling companies a ton-mile tax based upon the Wisconsin mileage, no matter whether the mileage is made on an interstate or intrastate haul. There is no attempt to impose a burden upon those engaged in interstate commerce that is not imposed with absolute equality upon those engaged exclusively in intrastate commerce. The suggestion that the law constitutes an infringement upon the rights of those engaged in interstate commerce, it seems to us, is worthy of no further consideration.

The tax imposed is not the same upon vehicles used for the transportation of passengers that it is upon vehicles used for the transportation of freight. The tax imposed upon vehicles for the transportation of passengers is static, while the tax imposed upon vehicles used for the hauling of freight is graduated and increases with the weight of the vehicle. This is no doubt due to the belief of the legislature that the damage done the highways by trucks hauling deadweight freight increases in proportion to the weight of the load,—a fact which is not true with reference to vehicles hauling passengers. The court cannot say that this classification is not supported by any reasonable basis.

The auto transportation law and the motor vehicle hauling company law gives rise to this situation: under the

motor vehicle hauling law every person using a truck on the highway for the carriage of freight must pay a tax. No person using a motor vehicle on the highway for the purpose of carrying passengers, whether for hire or not, is required to pay a tax unless he is a common carrier. It is said that this discriminates between the person using his automobile either for hire or otherwise and the person who uses his truck for purposes in connection with his own personal affairs. This is true, but it results from the obviously permissible classification of motor vehicles devoted to the carrying of passengers on the highway and vehicles carrying freight upon the highway. We think it is generally recognized that the vehicle carrying freight upon the highway perpetrates greater damage upon the highway than a motor vehicle simply carrying passengers. Their construction is different and their reaction upon the highway is different. The classification is permissible.

It is further contended that the act does not provide for the taxation of trucks in interstate commerce which have solid tires. We do not appreciate counsel's contention in this respect. It is apparently based upon a misconstruction of the statute. We cannot read out of the statute the interpretation which counsel evidently places upon it. What we have intended as a faithful review of counsel's assault upon the statute based upon improper classification reveals nothing which condemns the statute as denying to any one the equal protection of the law.

We now pass to a consideration of the challenged exemptions provided by the law. Of these there are two: one is, the exemption from the law of vehicles of less than three tons in weight. We have recently considered the power of the legislature to create exemptions from taxation in *Milwaukee E. R. & L. Co. v. Tax Commission*, ante, p. 523, 242 N. W. 312 (decided April 5, 1932). The authorities in this state upon that subject were there reviewed, rendering

unnecessary a comprehensive consideration thereof at this time. It is well established in this state that there is the amplest power on the part of the legislature to exempt an entire class of property from taxation, and to make such class very narrow. In this connection, consult *American Sugar Refining Co. v. Louisiana,* 179 U. S. 89, 21 Sup. Ct. 43; *State Board of Tax Comm'rs v. Jackson,* 283 U. S. 527, 51 Sup. Ct. 540. This principle affords ample justification for the exemption from this tax of all vehicles of less than three tons in weight.

The next challenged exemption is "Motor vehicles, trailers or semi-trailers used or operated exclusively in transporting or delivering dairy or other farm products between the point of production and the primary market." This is obviously an exemption prompted by the state's consideration of one of its most basic industries and one upon which the prosperity of the state greatly depends. Not only this state, but the nation as well, has become solicitous concerning the stern realities facing the agricultural and agrarian population of the country. The economic pressure upon the farmers has given concern to all who realize that a well balanced economic condition cannot lay out of consideration the welfare and the prosperity of the farmer. This fact finds ample illustration in the governmental favors extended to the farming classes which have recently been sustained by the courts, many of which were reviewed and pointed out in *Northern Wis. Co-op. Tobacco Pool v. Bekkedal,* 182 Wis. 571, 197 N. W. 936. Where the general prosperity of the state is so interwoven with and dependent upon the prosperity of the farmer, the legislature, under the broad powers which it enjoys of selecting and classifying subjects for taxation, may very well relieve the farmer from a tax imposed upon those who make an extraordinary use of the highways. The highway is an institution made necessary in large part by the fact that we have farms. In the beginning

they were laid out and opened up largely for the benefit of the farmer and constituted an absolute necessity for his social existence. The use which he makes of them today is very much the same that he has traditionally made of them. By and large, he makes a much greater contribution to their construction and maintenance by virtue of his property tax than do those who make use of them for new and modern purposes. These and many other considerations which might be mentioned fully justified the legislature in exempting the farmers from this tax while using the highways in moving the products of the farm to their primary market. In these times the farmers should not be burdened with special taxes for the use of public facilities which were created, in the beginning at least, very largely for their use and benefit. There is a manifest difference between imposing a tax upon one who uses the highway as a place of business, or whose use of the highway wears it out and tears it to pieces, and imposing it upon one who makes a simple and normal, traditional and necessary use of it. And especially is this true at a time when the welfare of the farmer is regarded with such great solicitude on the part of every intelligent member of society. This exemption rests upon a substantial basis. Our conclusion is that the statute is a valid enactment.

We now come to consider some of the constructions placed upon the act by the Public Service Commission which are challenged. In the interest of public service and an orderly administration of the law, we will pass upon these controverted questions of construction so far as we feel ourselves upon apparently safe ground and in a position where we can as well decide the questions of law raised in this manner as where the questions are specifically presented in a case involving facts giving rise to a controversy over the proper construction. As has been said, questions of this

nature are often dependent upon special facts and circumstances, and, where such appears to be the case, the court will reserve a decision until the question is presented upon a definite statement of facts. The latter policy is always to be preferred, but very often a desire to serve the public interest will prompt the court to go so far as it safely may in construing questions which are plainly revealed by an analysis of the act under consideration. *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209; *Income Tax Cases,* 148 Wis. 456, 134 N. W. 673, 135 N. W. 164; *Interstate Trucking Co. v. Dammann,* 208 Wis. 116, 241 N. W. 625.

A controverted question of construction arises upon the very first exemption mentioned in sec. 194.16, Stats., which exempts from the provisions of the act "motor vehicles in single units, or in combinations with other motor vehicles or trailers or semi-trailers where the aggregate weight of such units or combinations does not exceed three tons." The question is, What does the term "weight" and the term "aggregate weight" mean as used in this exemption? It is plain that the term "weight" may mean the net weight or the gross weight of the truck. The Public Service Commission has construed the term "weight" as meaning the weight of the truck plus its licensed carrying capacity. This is the "weight" upon which the license fee provided by sec. 85.01 (4) (c) is based. Plaintiffs properly argue that there is no applicable analogy between sec. 85.01 and sec. 194.16, and that a reference to the weight as plainly defined in sec. 85.01 furnishes no help whatever, in construing that term in sec. 194.16 (1) (a). Sec. 85.01 prescribes a license fee which is to be paid upon all classes of motor vehicles, and which fee, upon some classes, is graduated according to the weight, and the weight contemplated by the legislature for the purposes of that statute is clearly defined. We think it does not necessarily follow, nor in fact does it follow at all,

that because it is specifically provided in sec. 85.01 that the license fee to be charged upon trucks under the provisions of that section includes gross weight, which means the weight of the truck plus the weight of the load which it is capable of carrying, it indicates that the term "weight" in sec. 194.16 means the same thing. However, reliance is placed on other provisions which it is claimed support the conclusion that the term "weight" in sec. 194.16 means the gross weight, or the weight of the truck plus its licensed capacity. We pause here to remark that the term "licensed capacity" does not seem to have any definite or prescribed meaning in the law, but we assume it to mean carrying capacity, as found by the secretary of state in his classification for licenses under the provisions of sec. 85.01. In the first place, this law imposes a tonnage tax, and in computing this tax it is specifically provided in sec. 76.54 that the licensed capacity of the truck shall be added to the weight of the truck. This is not very persuasive, because the tonnage might be arrived at in this manner whether the exemption referred to the net or the gross weight of the truck.

Another provision of the law upon which reliance is placed is found in sec. 194.16 (3), which requires the application for a permit to contain "a complete description of the motor vehicles, trailers or semi-trailers which the applicant proposes to operate, including the weight and licensed carrying capacity of each motor vehicle," etc. This requires the applicant for a permit to state the gross weight of the truck. It is to be observed, however, that, as here used, the "weight and licensed carrying capacity" of the truck seems to be regarded as two separate elements. Weight is referred to as one item and licensed capacity of the truck as another. The weight is to be stated separately and the licensed carrying capacity of the truck is to be stated separately. It must be said also that the weight of the truck and the licensed capacity of the truck are considered as separate entities in

sec. 76.54 (3), where it requires the licensed capacity of the truck in pounds to be added to the weight of the motor vehicle in pounds. The manner in which the term "weight" is used in these separate connections indicates that the legislature regarded the weight of the vehicle as one thing and its licensed carrying capacity quite another, and affords rather strong evidence that the term "weight," as used in the exemption provision we are now considering, meant the net weight of the truck. However, there is to be offset against these considerations the further consideration that the very purpose of the act was to secure compensation from those using the highways of the state for the purpose of hauling heavy loads.

We find upon reference to the records in the office of the secretary of state, of which we take judicial notice, that the state has licensed 123,317 trucks. The gross weight of 94,497 of those licensed does not exceed 6,000 pounds for each. This leaves only 28,820, or approximately thirty per cent. of the whole number licensed, to which the provisions of sec. 194.16 can apply if the term "weight" in the exemption means gross weight. Furthermore, sec. 194.16 does not apply to trucks used exclusively in villages and cities, which would tend to decrease the number of trucks to which the provisions of sec. 194.16 apply. If the term "weight" in the exemption means the net weight of the truck, there must be a further very substantial decrease in the number of trucks to which the law can apply. Just what this number is, cannot be readily ascertained. There are 24,105 licensed which have a gross weight ranging from 6,001 to 12,000 pounds. There must be a very large number in this class the net weight of which is less than 6,000 pounds. It seems quite possible, if the term "weight" as used in the exemption is to be construed as the net weight of the truck, that there will be very little left of the law. The exemption may take out from under its provisions such an overwhelming propor-

tion of the trucks operating upon the highways as to leave a relatively small proportion to which the law has any application at all.

A dominant rule in the construction of statutes is to discover and give effect to the legislative purpose. To discover that purpose, the object sought to be accomplished by the statute should be given great consideration. The purpose sought to be accomplished here is plain, but the extent of that purpose is not so plain. We do know that the legislature intended to exact a ton-mile tax from some trucks but not from all trucks. The language used in the statute indicates that it intended to exempt trucks having a net weight of 6,000 pounds. If by according to the term "weight" the meaning which the act taken as a whole indicates to have been the meaning intended, should defeat the whole purpose of the act, then we would not be justified in according to the language used its literal meaning or the meaning which is indicated by the general terms of the act. However, we cannot say from the information at hand that to construe the exemption as applying to all vehicles having a net weight of 6,000 pounds will defeat the purposes of the act. It appearing so clearly in other parts of the act that the term "weight" is used to indicate the net weight of the truck as distinguished from the net weight of the truck plus its carrying capacity, we feel that as it is used in the exemption provision it must be so construed. We therefore are forced to the conclusion that sec. 194.16 does not apply to any trucks which did not have a net weight in excess of three tons, and the expression "aggregate weight of such units" as used in the exemption under consideration obviously means the net weight of the combination.

The law provides—sec. 194.16 (2)—that "No motor vehicle hauling company shall use or operate any motor vehicle, trailer or semi-trailer over any public highway in this

state without first obtaining a permit therefor from the Railroad Commission." Where a motor vehicle hauling company uses a combination of this kind, the net weight of which exceeds 6,000 pounds, it is plainly violating the law and incurring the penalty denounced by the statute. Whether a single use of a trailer or any other unit in a combination of this kind places the hauling company in a position where it can be compelled to take out a permit for the unit, and pay the ton-mile tax required by the act on all of the movements of the unit during the year, is a question which we shall not now decide.

Various questions have been raised with reference to the exemption of motor vehicles used or operated exclusively in transporting or delivering dairy or other farm products between the point of production and the primary market. The questions thus raised were thoroughly and rather exhaustively considered by the Public Service Commission in a pronouncement made by it on the 26th day of March, 1932, which is attached to the complaint as an exhibit. In that pronouncement the commission says:

"*Dairy and other farm products vehicles exempt*—Exception (c) seeks to exempt the owners of vehicles handling dairy or other farm products from the ton-mile tax. 'Motor vehicles, trailers or semi-trailers used or operated exclusively in transporting or delivering dairy or other farm products between the point of production and the primary market.' Because of the many diverse and unusual means of transporting dairy and other farm products, the paragraph calls for a definite statement of administration.

"We have considered the various practices in the handling of dairy and other farm products that have been called to our attention, as well as others of which we have had firsthand knowledge. As a result of this consideration we have adopted the definitions given below.

"*Point of production*—The term 'point of production' which is used in this exemption is not difficult of interpreta-

tion. It means the farm where the livestock is prepared for disposal, where milk is produced, agricultural products are raised, or where dairy farm products are made. 'Point of production,' therefore, includes cheese factories and creameries where cheese and butter are made by the producers of the milk and cream.

"It is the general practice in the cheese and butter industries, for farm producers of milk or cream to own or operate jointly a creamery or cheese factory where they hire a cheese or butter maker and pay him a specific amount per pound for the making. Cheese and butter were originally produced on the farm and the present general method of producing butter and cheese is but an extended farm operation, so considered by agricultural authorities. We call attention to the phraseology of the exemption, 'dairy or other farm products.' We construe the phrase to mean that cheese and butter produced at factories or creameries may be *dairy farm products* in the intent of the legislature. The same construction may not be put upon malted, condensed, evaporated, powdered milk, or ice cream.

"*Primary market*—No definition of 'primary market' can be devised which can eliminate the necessity of interpretation in the light of the peculiar facts and circumstances of particular cases. We believe that this commission can, *in concrete cases,* recognize and identify a 'primary market,' and rule accordingly. This is a common and necessary practice in the construction of constitutions and statutes.

"We therefore find that what is a 'primary market' must be determined in the light of the facts and circumstances of the particular situations. As a general rule, subject to qualifications by the facts of particular cases as they arise, a 'primary market' will be construed to be that place where, in the usual and normal course of marketing, dairy and other farm products first pass out of the possession or control of the producer irrespective of whether such dairy and other farm products are transported to 'primary market' by the producer or by his agent.

"The word 'agent' as above used is meant to include, among other classes of agents: (1) the farmer hauling in a co-operative or other capacity for other farmers, whether

for hire or not; (2) the person making a business of transporting dairy or other farm products for hire from the point of production to the primary market; and (3) the proprietor of a plant or factory, or his agents, transporting such products from the point of their production to primary market; whether, in any of these cases, such products are transported from a single point or from several points of production.

"The owner of any vehicle for which a permit was secured in conformity with the interpretation of the exemption relating to dairy or other farm products contained in the commission's memorandum opinion of February 4th, but for which permit is not required under the construction placed upon that exemption in this order, will, upon the filing of an affidavit to that effect and surrender of the permit and permit plates, receive a refund of the permit fee paid upon such vehicle.

" 'Exclusive' use of vehicles transporting dairy or other farm products—The word 'exclusively' as used in this exemption requires interpretation. The question has arisen whether this exemption should be interpreted to mean that where a vehicle is used indiscriminately in the transportation of dairy or other farm products and of other commodities, its operation at such times as it may be hauling dairy or other farm products only is exempt, or whether its entire mileage, including its operation with dairy or other farm products, is to be taxed. A milk hauler may make a thousand miles each month in the business of hauling milk between the point of production and the primary market; with the same vehicle he makes another thousand miles a month hauling lumber. Does the tax apply on the movement of the lumber only, or on the combined lumber and milk movement? If a vehicle is used indiscriminately in the transportation of dairy or other farm products and of other commodities, it is, of course, required to be permitted. The question is therefore answered by the commission's ruling, already set forth in this order, that the entire operation of any permitted vehicle on the highways of the state outside of the corporate limits of cities and villages, is subject to the ton-mile tax assessment. We believe that an interpretation of this exemption which would relate the word exclu-

*sively* to the individual haul of a permitted vehicle instead of to the entire operation of the vehicle, would make the law unenforceable.

"In this connection the further question presents itself, whether where a farmer incidentally uses the truck in which he hauls his produce to market, for the transportation of such articles as are normally required for use in his household or in his farming operations, he shall be held to be using such truck indiscriminately in the transportation of dairy or other farm products and of other commodities, and therefore be required to take out a permit on the truck and consequently pay a ton-mile tax on its entire operation. The commission finds from its study of the situation that if farmers are required, because of such incidental use of the vehicles in which they haul their produce to market, to take out permits on such vehicles, the great majority of farmers will be required to pay a ton-mile tax on the produce which they themselves haul to market, because they cannot avoid such incidental use of the vehicles in which they transport their produce to market, without subjecting themselves to great inconvenience and expense. Under these circumstances the commission, in order to give effect to the intention of the legislature to relieve the farmer of the tax on his movement of dairy or other farm products, holds that a farmer shall not be required because he incidentally uses the vehicle in which he hauls his produce to market for the transportation of such articles as he normally requires for use in his household or in his farming operations, to secure a permit for such vehicle and pay a ton-mile tax on its operations.

"So also where a group of farmers co-operates in the exchange of transportation service, not for hire, each of the vehicles thus used may carry back, but not for hire, for each of the group to his point of production, such articles as are normally required for use in the household or in his farming operations, without losing the status of an exempt vehicle. This does not permit the farmers' agent hauling for hire to transport to the point of production of the dairy and other farm products the commodities essential to the conduct of the farming operation in the same way the producer may return such commodities."

This construction of the commission meets with our entire approval and leaves nothing further to be said.

A further question is raised as to whether vehicles coming under the provisions of sec. 194.16 must pay the tonnage tax upon all of their movements upon the highways of the state outside cities and villages, whether they are running empty or loaded. The Public Service Commission has ruled that the tonnage tax applies upon all their movements. We think the' law plainly so requires. The tax is imposed by sec. 76.54. This imposes the tax upon auto transportation companies as well as motor vehicle hauling companies. For passenger busses operated by auto transportation companies the tax is computed as follows: the number of passengers capable of being seated, including the driver, in each motor vehicle shall be multiplied by one hundred fifty and to this result shall be added the weight of the vehicle in pounds. The total shall be multiplied by the number of miles operated within the state and the amount thus obtained divided by two thousand. The tonnage in this instance is plainly computed on the hypothesis that the bus is at all times loaded to its full seating capacity. As to "freight-carrying vehicles," it is provided that "the licensed capacity of each motor vehicle, trailer or semi-trailer, in pounds shall be added to the weight of the motor vehicle trailer or semi-trailer in pounds." This sum shall be multiplied by the number of miles the vehicle is operated and the amount thus obtained divided by two thousand. It is contended that the phrase "freight-carrying motor vehicles" must mean vehicles carrying freight, and that in order to be subject to the tax they must be carrying freight, consequently they are not subject to the tax when they are running empty. It will be noted that even this contention assumes that the trucks are taxed at full capacity if they are carrying any freight at all. The contention is that they are not freight-carrying vehicles when

they are running empty and, consequently, not subject to the tax. However, it is plain that the phrase "freight-carrying motor vehicles" as there used has no such significance. It is simply used for the purposes of distinguishing them from passenger busses. There can be no doubt that the legislature intended to impose the tax upon freight-carrying vehicles while running empty just as is plainly provided with reference to busses while running empty.

A question is discussed as to whether motor trucks with permanently fixed equipment, never used for hauling merchandise but only to transport itself with its equipment from place to place, such as tree movers, earth borers, air compressors, power trucks, line trucks, etc., are subject to the tax. We feel that this is a question which might better be reserved until a specific case is presented, and we shall enter upon no discussion of it here.

We find no occasion for issuing an injunction. We find ourselves in disagreement with the Public Service Commission on only one point, and that is that the exemption applies to the net rather than the gross weight of the trucks. We feel that the commission will be governed by our views upon the question, and that there is no necessity for the issuance of an injunction.

*By the Court.*—The demurrer to the complaint is sustained.