Jones, J.
 

 It is a well-established rule that a private carrier cannot be converted into a common carrier merely by legislative fiat.
 
 Frost & Frost Trucking Co.
 
 v.
 
 Railroad Commission of California,
 
 271 U. S., 583, 46 S. Ct., 605, 70 L. Ed., 1101, 47 A. L. R., 457. The Ohio Motor Transportation Act does not attempt this; it defines a motor transportation company as applying to a person or corporation providing or furnishing transportation
 
 service, for hire, for the public in general.
 
 Section 614-84, General Code. It is a question of law for the courts to determine what constitutes a common carrier, but it is a question of fact for the commission to determine whether one charged as a common carrier comes within that definition and is carrying on business in that capacity. 10 Corpus Juris, 40;
 
 Breuer
 
 v.
 
 Public Utilities Commission,
 
 118 Ohio St., 95, 160 N. E., 623;
 
 New York Central Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 121 Ohio St., 588, 170 N. E., 574;
 
 C. Sheets & Sons
 
 v.
 
 Public Utilities Commission,
 
 124 Ohio St., 347, 178 N. E., 416. Section 614-84, General Code, confers upon the Public Utilities Commission the power to determine such fact. Pur
 
 *52
 
 suant to this power the commission found that the circumstances detailed in the record and the method of plaintiff in error’s operation were such as'to constitute it not a private.but a public carrier. This finding was evidently based upon the fact that the plaintiff in error held itself out ready to carry film commodities for any of that class of the public comprising motion picture exhibitors who might desire transportation service for their films, and upon the further fact that the number of the public secured was without limit except as limited by the aggregate amount of its authorized corporate shares.
 

 The articles of incorporation of the plaintiff in error stipulated that its purpose was to engage in the business of hauling films and commodities “for such persons or concerns as may be connected with this corporation, either as stockholder, officer, director or employe, and to render such other services to such class of persons and concerns as may be advisable from time to time.” "While it is true that the question whether the plaintiff in error was or was not a public utility depends not upon its powers but upon its acts, still its charter purposes may be taken into consideration as reflecting in some degree upon the operative methods of the business in which it was engaged. Mr. Chesbrough, the head of the corporation, was its presiding genius. He frankly testified that if he had the chance of selling stock to any applicant that wanted to come into the scheme he would do so, and that the number of shareholders that might come into the plan of operation was limited only by the number of shares in the corporate structure. While there is some testimony that theater owners were solicited to enter into the scheme, Mr. Chesbrough denies that any one was authorized to solicit them to do so; however, he confesses that he himself “talked to several exhibitors around town” about his scheme of stock operations. He also testified that he would sell a share of stock
 
 *53
 
 to any applicant who wanted to become a member of the corporation, and would haul their films for them. And upon the feature touching the question whether the public in general could enter into the scheme he was asked the question: “Q. You would not object to selling any other stock if you had the chance? A. Absolutely not.” We are inclined to the opinion that the commission was warranted in finding that, while the plaintiff in error was posing as a private carrier in name, it held itself out as a public carrier in fact and open for service to any film exhibitor who would subscribe for stock in its corporation.
 

 If such a device, as here disclosed, were upheld there would be nothing to prevent other companies, similarly organized, from peddling their shares of stock to the public, thus securing public patronage limited only by the number of shares authorized by their charters. It is true that in the instant case but two hundred and fifty shares were authorized; but, if this sort of scheme were allowed, what would prevent similar corporations, with a much greater number of shares, from carrying on similar activities ? Tire companies, automobile concerns, or dealers in other commodities could incorporate, and, by allocating their stock among their shareholders, and posing as private carriers, could use the highways of the state without any regulation by the Public Utilities Commission. The attorney examiner of the commission foresaw that eventuality when he stated: “You can readily see what would happen if the shippers of Columbus would get together and form an affiliated service corporation with every shipper of all kinds of freight holding a share of stock.” The utilization of this corporate device, together with the fact that the president of the association admitted that he was peddling the shares of the corporate stock to any film exhibitor who desired to enter its scheme of operation, justified the order of the commission requiring the plaintiff in error to cease
 
 *54
 
 from operating as a motor transportation company, without a certificate, and from carrying property for hire over the public highways of the state.
 

 In
 
 Motor Freight, Inc.,
 
 v.
 
 Public Utilities Commission,
 
 125 Ohio St., 349, 353, 181 N. E., 479, we had occasion to allude to the case of
 
 Frost S Frost Trucking Co.
 
 v.
 
 Railroad Commission, supra,
 
 wherein the majority of the high federal court held that the Frost Trucking Company was a private carrier not subject to regulation. However it is therein stated that the Frost Trucking Company, the carrier, was “engaged under a single private contract” for the transportation of citrus fruit. Alluding to the claim advanced by the commission that it was within the power of any carrier, by the simple device of making private contracts with an unlimited number, to secure all the privileges afforded common carriers without assuming any of the latter’s duties or obligations, Mr. Justice Sutherland closed his opinion with the following statement: “It is enough to say that no such case is presented here; and we are not to be understood as challenging the power of the state, or of the railroad commission under the present statute, whenever it shall appear that a carrier, posing as a private carrier, is in substance and reality a common carrier, to so declare and regulate his or its operations accordingly.” "We think that the operations of the plaintiff in error in this case fall within the implied condemnation of the language used by Mr. Justice Sutherland; that the device adopted and the method employed by the plaintiff in error in securing film' exhibitors to become stockholders in its corporation, and agreeing to carry their products, characterize it as a “motor transportation company” as defined in Section 614-84, General Code, which is subject to regulation, by the Public Utilities Commission.
 

 Whether the principles announced in
 
 Hissem
 
 v.
 
 Guran,
 
 112 Ohio St., 59, 146 N. E., 808, should be sus
 
 *55
 
 tained or modified we leave for future determination depending upon the facts presented; but in any event we are not disposed to extend its application to a state of facts such as this case presents.
 

 The order of the commission is neither unreasonable nor unlawful and it is therefore affirmed.
 

 Order affirmed.
 

 Weygandt, C. J., Day, Allen and Stephenson, JJ., concur.
 

 Bevis and Matthias, JJ., not participating.