NORTH SHORE FISH & FREIGHT COMPANY AND ANOTHER
v. NORTH SHORE BUSINESS MEN'S TRUCKING
ASSOCIATION.[1]

November 1, 1935.

No. 30,500.

[1]Reported in 263 N. W. 98.

*Jenswold, Jenswold & Dahle,* for appellants.
*Johnson, Chapman & Bruess,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiffs are and ever since December 3, 1925, have been duly authorized to transport property between Duluth and Grand Marais and intermediate points as common carriers, with certain restrictions not material here, such authority having been appropriately granted by the railroad and warehouse commission. Both have made investments in transportation equipment in substantial amounts, and, prior to defendant's entry into the competitive field

of transportation upon this line, enjoyed profits from their operations. They are the only transportation agencies so authorized in this area, except that railroad service between Duluth and Two Harbors exists. The route is upon U. S. highway No. 61, formerly known as state highway No. 1. Defendant is a coöperative association created and existing by virtue of and pursuant to the provisions of L. 1923, c. 326, as amended by L. 1933, c. 148, 3 Mason Minn. St. 1934 Supp. § 7834. The purposes of the association are stated in its articles to be: "* * * to secure for the members hereof economical transportation of the goods, wares, merchandise or any other articles or commodities belonging to or owned by members to or from said members, by group and/or collective hauling and transporting of said goods by association owned and/or leased, and/or hired boats, wagons, trucks, or any other vehicles to be used in the hauling and transportation of said goods of the members and/or association. The association shall have all powers necessary to effectuate the above purpose." And these also provide that it shall "be a non-stock coöperative association." Its net income, except amounts required to be set aside as a reserve fund or permanent surplus, is to be distributed only on the basis of patronage. Members are admitted upon application to be approved by the manager, if there be one; if not, then by the board of directors. The annual membership fee was fixed at one dollar, later reduced to 50 cents, but in event of another coöperative association joining defendant the fee was to be 25 cents for each member of the joining association. "Any coöperative association organized under this act may become a member of this organization as well as any individual." Immediately upon the perfection of the corporate enterprise its organizers entered into a campaign for membership, with result that practically all the fishermen along the north shore of Lake Superior became such. There are approximately 240 of these. In order to have a return haul from Duluth to Grand Marais and intermediate points it was deemed desirable to get businessmen in Duluth and in the towns and communities to be served by this enterprise to join, thereby affording defendant freight transportation in both directions. There were 70 such memberships procured,

so that at time of trial below the total membership was 310. As a matter of fact no one asking for such membership has been refused. The making by defendant of the lower transportation charges was the convincing and persuasive argument used to get them into the fold. Prior to 1932 plaintiffs had furnished transportation service to the fishermen. During that year the latter organized the North Shore Coöperative Fisheries and took into their own hands the transportation of their fish to Duluth. But their trucks thus operating could not carry goods and property back from Duluth to the people on and along the North Shore without compliance with the law relating to common carriers. To lessen their transportation costs these parties hit upon their present scheme of incorporating under the cited act in the belief that by so doing they could avoid the common carriers' act, L. 1925, c. 185, 1 Mason Minn. St. 1927, § 5015-1, *et seq.*, as well as the contract carriers' act, L. 1933, c. 170, 3 Mason Minn. St. 1934 Supp. § 5015-20, *et seq.* The charges made by defendant as a transportation organization are much less than those authorized by the commission and applicable to common carriers generally. As a consequence plaintiffs' business has suffered and will continue to suffer to such extent as is likely to drive them out of the transportation field. Of course plaintiffs are required to charge the rates fixed by the commission, under whose direct regulation and control they are. Defendant has done nothing to comply with the laws pertaining to common carriers or contract carriers. To end the intolerable situation hereinbefore related plaintiffs brought this suit seeking to enjoin defendant from thus operating. They assert that defendant's coöperative enterprise was colorable only; that the membership arrangement is a mere guise to avoid the regulation and control that legislative enactments require to be placed in the hands of the railroad and warehouse commission; that in truth and fact it is operating as a common carrier for hire; that, in any event, if this be not so, it is operating as a contract carrier in contravention of our statutes relating to such.

The record is singularly free from conflict. The questions involved relate purely to the legal conclusions to be drawn there-

from. The trial court was of opinion that "a coöperative transportation company, when properly operated under our coöperative laws, need not go to the railroad and warehouse commission for further authority. Inequalities will creep in, especially when laws overlapping each other are passed. The inequality complained of in this case is for the legislature rather than the courts." The court concluded that defendant "is not a common carrier for hire * * * nor a contract carrier for hire"; that plaintiffs' prayer for a permanent injunction should be denied; and that defendant recover from plaintiffs its costs and disbursements. Being unsuccessful on their blended motion for amended findings and conclusions of law or new trial, plaintiffs appeal.

There is much to be said in support of plaintiffs' claim to the effect that defendant is in truth and in fact either a common or contract carrier. The evidence leaves no doubt that it is engaged in active and efficient competition with duly organized and authorized carriers in that area. The obvious purpose of its organizers has borne fruit. A more efficiently competitive organization could not very well be devised. If we are to assume that by such procedure as defendant has adopted in the instant case it may hurdle regulations prescribed by law applicable to lawfully regulated carriers in general, then indeed the carriers' acts are idle gestures devoid of every purpose of their enactment. Were we to sustain defendant's claim that it is free from official regulation because it is coöperative, we must necessarily permit the scrapping of our carriers' acts. We think defendant should not be permitted to accomplish the purpose for which it now seeks judicial sanction. Obviously, there will be nothing under such circumstances to prevent farmers, merchants, manufacturers—in fact, industries and business of practically every type—from organizing similar "coöperatives," making them of state-wide ramification, and thereby, because of lack of regulation, permitting them to enter into active competition with regularly organized and officially regulated transportation agencies. So to hold, it seems to us, is to deny the existence of any legislative purpose in adopting the carrier acts. Thereby such enactments become mere scraps of paper. To avoid such obviously harmful

results it has become "a dominant rule" of statutory construction "to discover and give effect to the legislative purpose. To discover that purpose, the object sought to be accomplished by the statute should be given great consideration." State ex rel. Wisconsin A. T. O. Assn. v. Public Service Comm. 207 Wis. 664, 678, 242 N. W. 668, 674. And the South Dakota court in Mitchell Produce Co. v. Morrison, 63 S. D. —, 257 N. W. 47, 49, 50, has this to say: "One well-recognized rule to be followed to aid in the construction of statutes is to consider what might happen under such statutes if they should be given the construction contended for." And, further, "that the legislature, when it passed the act, did not intend such transportations to be exempt, and we ,may judicially notice that to hold them exempt would practically nullify the act." We think there is ample judicial authority to sustain plaintiffs' position. In fact there are so many cases that a review thereof would unduly extend this opinion. The following illustrate how courts have thrown into discard various and varied schemes to avoid statutory requirements relating to control and regulation of public carriers. State ex rel. Bd. of Railroad Commrs. v. Rosenstein, 217 Iowa, 985, 252 N. W. 251; Goldsworthy v. Public Service Comm. 141 Md. 674, 119 A. 693; Restivo v. Public Service Comm. 149 Md. 30, 129 A. 884; Parlett Co-op. Inc. v. Tidewater Lines, Inc. 164 Md. 405, 165 A. 313; Michigan Public Utilities Comm. v. Krol, 245 Mich. 297, 222 N. W. 718; Public Utilities Comm. v. Boughtonville Farmers' Exch. Co. 40 Ohio App. 395, 178 N. E. 859; Affiliated Service Corp. v. Public Utilities Comm. 127 Ohio St. 47, 186 N. E. 703; Davis v. People ex rel. Public Utilities Comm. 79 Colo. 642, 247 P. 801; 10 C. J. 41 [§ 10]. In the Rosenstein case (217 Iowa, 988) the statute made it "unlawful for any motor carrier to operate or furnish public service * * * without first having obtained from the commission a certificate declaring that public convenience and necessity require such operation." The facts in that case are in many respects similar to those in the case at bar. The court said, 217 Iowa, 989:

"The question whether one is a common carrier can sometimes be known only by particular proof of how his business is conducted,

and what professions he made to the public regarding it.  *  *  *
The test is not whether he is carrying on a public employment, or
whether he carries to a fixed place, but whether he holds out, either
expressly or by a course of conduct, that he will carry for hire, so
long as he has room, the goods of all persons, indifferently, who
send him goods to be carried.  *  *  *

"It is not necessary, however, to classify one as a public carrier,
that he be required to carry goods of any description for every per-
son offering the same.  It is not necessary that he carry all kinds
of goods, if he professes to carry only a certain kind, and, if so,
this does not take from him his status as a common carrier."

In that case the defendant was held to be a common carrier be-
cause, said the court, 217 Iowa, 992:

"From the evidence introduced  *  *  *  we are constrained to
find that it was the purpose of the defendant Rosenstein to offer his
transportation service to all theaters in his territory if he could
induce them to enter the association agreement.  *  *  *  if his
service was offered to all the public engaged in that class of mer-
chandise in his territory, there would be no reason for saying he
was not engaged in public transportation of such goods.  Under
such circumstances he would become a common carrier even though
all such theaters had signed the alleged association agreement."

We should remember always that the real test is not what a cor-
porate charter may say but rather and only what is the corporation
in fact doing.  Davis v. People ex rel. Public Utilities Comm. 79
Colo. 642, 247 P. 801.

The record establishes beyond question that for a merely nominal
fee of 50 cents all comers were not only welcomed but urged to join
defendant's organization.  A single shipment in many instances
would amply repay this investment and still leave the shipper a
margin below the cost of a regular shipment over the same route
by a duly constituted public carrier.  The obvious purpose of the
legislature in enacting the public carriers' acts is to protect the
shippers as well as the general public.  The extensive use of our
highways, the many dangers incident to motor vehicle traffic, espe-

cially large and unwieldy trucks, constitute genuine traffic problems. To avoid such exemption as defendant contends for, so it seems to us, it is necessary to give effect to what the legislature sought to accomplish in its acts intended to bring about a more orderly and a safer use of our public highways.

The first legislation in respect of regulating the transportation of freight by motor vehicles upon highways is found in L. 1925, c. 185, 1 Mason Minn. St. 1927, § 5015-1, *et seq.* That act was obviously found to be inadequate because, as therein defined, common carriers were limited only to those operating "between fixed termini or over a regular route." State v. Boyd T. & S. Co. 168 Minn. 190, 209 N. W. 872. This left other carriers beyond control of the commission. This situation was obviously intended to be remedied by L. 1933, c. 170, 3 Mason Minn. St. 1934 Supp. § 5015-20, *et seq.* We think the legislative purpose can best be shown by quoting the following therefrom:

"Section 1(f). The term 'common carrier' means any person who holds himself out to the public as willing to undertake for hire to transport from place to place over the public highways of this state the property of others who may choose to employ him, but who does not operate between fixed termini or over a regular route and is not subject to Laws 1925, chapter 185.

"(g). The term 'contract carrier' means any person engaged in the business of transporting property for hire over the public highways of this state, other than as a common carrier. * * *

"Section 2(a). The Commission is hereby vested with power and authority and it is hereby made its duty to supervise and regulate every contract carrier engaged in intrastate commerce in this state to the extent provided in this act; to grant permits to such carrier upon the filing of an application therefor and the compliance with all lawful requirements; to require the keeping of such records and accounts and the filing of such reports as it may deem necessary to administer this Act; and before issuing a permit to any such carrier, it shall fix the minimum rates and charges for the transportation of property by such carrier, which rates shall not be less than

the reasonable cost of the service rendered for such transportation, including a reasonable return on the money invested in the business and an adequate sum for maintenance and depreciation of the property used.

"(b). The Commission is further vested with the power and authority and it is made its duty to supervise and regulate every contract carrier for the purpose of promoting safety on the highways and their conservation; to make rules and regulations respecting the lights and brakes used on the vehicles operated by such carriers and requiring the use of any and all safety devices that tend to make more safe the operation of such vehicles on the highways; to regulate the nature and character of the equipment to be used under a permit, the amount and character of tonnage which may be hauled thereunder on any motor vehicle and the method of loading or packing the freight transported, but the Commission shall not authorize the use of any equipment of greater dimensions or the transportation of tonnage of greater weight than is permitted by any existing law or any law which may be hereafter enacted; provided, however, that all such regulations shall be first approved by the Commissioner of Highways before the same shall become effective. To make such rules and regulations and require such reports under oath as may be necessary to the enforcement of this Act.

"Section 3. No person shall operate as a contract carrier in intrastate commerce without a permit from the Commission so to do in accordance with the provisions of this Act. * * *

"Section 9. No contract carrier as defined in this Act shall transport any property which it may own in whole or in part, except such property as may be necessary for the use of the owner of the truck or of his family and not for resale; provided, that such property may be transported for resale when transported directly to the place of business of the owner of the truck, or if such owner is a farmer to the farm of the owner.

"Section 10. The Commission shall have the same power and authority with respect to the regulation and control of common carriers as are set forth in Section 2 with respect to contract carriers. * * *

"Section 24. The business of operating a motor vehicle for the transportation of property by a contract carrier or a common carrier as in this Act defined upon the highways of this state is declared to be a business affected with the public interest. The rapid increase of motor carrier traffic and the fact that under existing law many motor trucks are not effectively regulated, have increased the dangers and hazards on public highways and make it imperative that more stringent regulations should be employed to the end that the highways may be rendered safer for the use of the general public *and that the discrimination in rates charged may be eliminated.*" (Italics ours.)

Defendant's articles of incorporation assume to authorize "transportation" as its objective. There is nothing in the amending act (L. 1933, c. 148) indicating that there was a legislative purpose to give such coöperative enterprises special treatment or exemption so as to bring them without the regulations of the commission. Chapter 170 is a later enactment. Nothing is therein said to differentiate such corporations as defendant from other corporations. Defendant is obviously a corporate body—a legal entity. As such, when it engages itself to transport the goods of another, even if such other is called a "member," nevertheless there is a contract relationship between them. The person so dealing with it undoubtedly has the right to sue in event of breach of contract by defendant and, similarly, may sue for damages in event defendant happens to be negligent so that loss occurs.

The language used and the reasoning employed by the court of appeals of Maryland in Parlett Co-op. Inc. v. Tidewater Lines, Inc. 164 Md. 421, a case similar in many respects to ours, seem appropriate:

"* * * where the purpose of the statute is to protect the state's highways and insure the public safety, there can be no valid reason for applying it to one class of public carriers and not to another, when both use it in the same way, damage it the same way, and create the same hazards."

So here, whether motor trucks are owned and operated by a common carrier or a contract carrier, either corporate or individual, all use the highways "in the same way, and create the same hazards." No reason appears why one should be excluded and the other included. Defendant is in fact operating as a carrier of property, goods, and products not its own but those of individual owners. Were we to construe the statute under which defendant is organized in accordance with its claims a serious constitutional question would be involved. The syllabus in the Parlett case, hereinbefore cited, lucidly states the danger [164 Md. 406]:

"A statute exempting co-operative associations, transporting freight for their members for hire, in competition with common carriers, from the operation of a statute, passed for the protection of the public highways, which requires public carriers for gain to obtain a permit from the Public Service Commission, would be unconstitutional as involving an arbitrary and unreasonable classification.

"A statute will not be construed so as to render it unconstitutional, when it is open to a construction which is fair, reasonable, and wholly consistent with the constitution."

See also Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. ed. 1264.

The right to form a coöperative association to engage in the transportation of the goods and products of its members is not involved and is not questioned. All that we hold is that, having formed such association, before defendant can enter into the transportation field it must apply to and receive from the railroad and warehouse commission authority to transact such business; this for the simple reason that the law has placed with that body jurisdiction and control of such business for the safety and protection of the highways and the public in general. Nor do we think defendant is justified in its claims that it will be injured thereby because of the higher rates it may be required to charge by the commission. Under its articles the profits derived from the business are distributed amongst the members in proportion to the amount of business furnished; hence, on that score, defendant's members will be in no

worse position than they are now, excepting only that there is deferment of division of profits as and when made, whereas under its present operation it is giving its members a lesser rate to begin with.

We conclude that the order here for review should be reversed and the court below directed to grant plaintiffs injunctive relief.

So ordered.

DEVANEY, CHIEF JUSTICE, took no part.

