Marshall, C. J.
 

 ISiince March 17, 1924, the Cannon Ball Transportation Company has been operating a motor transportation service under certificate of convenience and necessity No. 633, granted by the Public Utilities Commission of Ohio, over a regular route, a part of which extends from the city of Ironton, Ohio, to the Ohio river, in the direction of Huntington, W. Va. That company is complying with all the requirements of the Public Utilities Commission and rendering satisfactory service. Over the protest of the Cannon Ball Transportation Company, the Public Utilities Commission granted the application of the Ohio Valley Bus Company for a certificate of public convenience and necessity to operate motor transportation over the same route; it appearing in the application that the Ohio ‘Valley Bus Company already had a certificate granted by the State’s Roads Commission of West Virginia to operate motor transportation over the highways of the sítate of West Virginia between the city of Huntington and the Ohio river, in the direction of Ironton, Ohio. It is therefore an interstate operation.
 

 In granting the certificate to the Ohio Valley Bus Company, a qualification was imposed as follows:
 

 “Being granted for interstate business only and on condition that applicant cannot pick up passengers in the state of Ohio whose destination is some other point in Ohio; the latter condition being imposed because a motor transportation com
 
 *567
 
 pany holding certificate 633 is now serving same route in Ohio. ’ ’
 

 This case, therefore, involves the sole question of the jurisdiction of the Public Utilities Commission of Ohio over such portion of an interstate operation as may be carried on within the state of Ohio.
 

 The Public Utilities Commission has proceeded upon the theory that any motor transportation company carrying on interstate operations and authorized by the proper authority of an adjoining state to operate to the geographic borders of this state may not be denied the right to extend such operations within and through the state of Ohio. It is claimed, however, that the commission does have the right under the statutes of Ohio to regulate the operations of the interstate transportation to any extent which will not amount to a restraint upon interstate commerce, or will not impose unreasonable burdens thereon. The certificate was in fact granted to the Ohio Valley Bus Company, and the Ohio Valley Bus Company is making no complaint of the conditions and regulations which were imposed upon it. The complaint in this case is made by a protestant, and the protestant, now serving the same route and serving the same in a satisfactory manner, contends that the commission is without authority to grant a certificate over that route to any other person or firm. It is not contended by protestant that the Ohio Valley Bus ¡Company does not have any right to operate its interstate business into and through the state of Ohio, but, on the contrary, its contention is that the commission has no authority to grant a certificate of authority so to do.
 

 
 *568
 
 Inasmuch as the Ohio Valley Bus Company is not permitted to receive passengers in the state of Ohio, whose destination is within the state, it is not apparent how the commission could have done more to protect the protestant against interstate operations, inasmuch as it is conceded that interstate operations cannot be prohibited altogether. It is apparent that no harm has been done to protestant unless protestant is prejudiced by the finding that there is a necessity for the interstate operation between the Ohio river and the city of Ironton.
 

 Manifestly the purpose of the commission in granting a certificate to the interstate company was to obtain jurisdiction over that company and to impose reasonable charges for the use of the highway, and reasonable regulations governing the manner of such use. In its last analysis the determination of this case turns upon the extent of the authority of the state commission over an interstate motor transportation company.
 

 The authority of the state is of course limited by the provisions of Section 8, Article I, of the federal 'Constitution, which provides that Congress shall have power to regulate commerce among the several states. On the other hand, Article X of the amendments to the federal Constitution provides that ‘ ‘ the powers' not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.”
 

 This court has heretofore dealt at some length with these provisions of the federal Constitution in the case of
 
 Akron & Barberton Belt Rd. Co. v.
 
 
 *569
 

 Public Utilities Commission,
 
 105 Ohio St., 553, 138 N. E., 74, and has at some length indicated the reserved powers remaining in the states. The discussion in the opinion in that case need not be repeated here. There is less embarrassment in this ease than in the case above cited, because there has so far been no federal legislation respecting interstate motor transportation. No rights have therefore been declared on behalf of the federal government, and no restrictions have been placed by Congress upon the powers of the states in relation to such commerce. Although the movements of the Ohio commission are apparently unhampered by federal legislation, or by any regulations of the Interstate Commerce Commission, the Ohio commission has nevertheless carefully refrained from doing any act or thing which might be held to be an unreasonable restraint or other direct burden upon interstate commerce.
 

 Since no complaint is made of the character of the conditions which have been imposed upon the interstate carrier, and since the only complaint is concerning the jurisdiction of the commission to grant a certificate at all to an interstate carrier, we will only discuss in this opinion the general question of the power to issue such a certificate and to impose reasonable conditions upon the carrier, assuming that the conditions which were in fact imposed upon the Ohio Valley Bus Company are in all respects reasonable.
 

 An interstate bus operation is different in many respects from interstate operations by rail transportation companies. The bus operation involves the use of public highways of the state and of the
 
 *570
 
 streets of incorporated cities and villages. Such use of highways and streets not only deteriorates the highways, thereby increasing the cost of maintenance, but involves the much more important consideration of the dangers incident to traffic congestion.
 

 Motor transportation in interstate commerce is a comparatively new institution, and Congress has not yet seen fit to enact any legislation on that subject. The Supreme Court of the United States has decided several cases involving certain angles of the subject, and those decisions will be found to cover the essential principles of the ca'se at bar. Two very recent cases have laid down principles which are applicable, both of which were decided on March 2, 1925:
 
 Buck
 
 v.
 
 Kuykendall, Dir. of Pub. Works,
 
 267 U. S., 307, 45 S. Ct., 324, 69 L. Ed., 623, 38 A. L. R., 286, and
 
 George W. Bush & Sons Co.
 
 v.
 
 Maloy et al., Pub. Service Comm.,
 
 267 U. S., 317, 45 S. Ct., 326, 327, 69 L. Ed., 627.
 

 The first of these was an exclusively interstate commerce operation between Seattle, Wash., and Portland, Ore., and involved the validity of a statute of the state of Washington prohibiting common carriers for hire from using the highways by auto vehicles in that state without a' certificate of convenience and necessity. Prior to the time of this litigation the highest court of the state of Washington had construed the section as applying to common carriers enga'ged exclusively in interstate commerce. The Supreme Court held that a statute so construed by the highest court of the state would be a restraint and a direct burden upon interstate commerce. It was incidentally
 
 *571
 
 stated in the opinion in that case that the statute defeated the purpose of Congress in legislating in favor of federal aid for the construction of interstate highways. It further appears in that case that Buck, if permitted to use the highways, was willing to comply with all laws relating to common carriers; but, even so, a certificate was denied him by the state director of public works. At page 315 (45 S. Ct., 326) of the opinion, we find the following:
 

 “It may be assumed that Section 4 of the state statute is consistent with the Fourteenth Amendment; and also that appropriate state regulations adapted primarily to promote safety upon the highways and conservation in their use are not obnoxious to the commerce clause, where the indirect burden imposed upon interstate commerce is not unreasonable. Compare
 
 Michigan Public Utilities Commission
 
 v.
 
 Duke,
 
 266 U. S., 571 [45 S. Ct., 191, 69 L. Ed., 445, 36 A. L. R, 1105]. The provision here in question is of a different character. Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition. It determines not the manner of use, but the persons by whom the highways may be used. It prohibits such use to some persons while permitting it to others for the same purpose and in the same manner.”
 

 It clearly appears from the foregoing that the Supreme Court of the United States does not deny to state agencies the power to regulate the use of highways, and to impose reasonable requirements as to equipment and safeguards against the dangers of traffic congestion, and any other regu
 
 *572
 
 lation which does not impose an unreasonable burden upon interstate commerce.
 

 The
 
 Bush case
 
 involved a statute of the state of Maryland. This case also related exclusively to interstate commerce, and Bush expressed a willingness and an intention to comply with all applicable regulations concerning • the operations of motor vehicles. It further appears that the state commission in refusing the permit considered merely “whether or not existing lines of transportation would be benefited or prejudiced, and in this way the public interest affected." In the
 
 Bush case
 
 the highways had not been constructed or improved with federal aid, and it was declared that this point of distinction from the
 
 Buck case
 
 made no difference. It was declared that federal aid legislation serves to make clear the purpose of Congress that state highways shall be open to interstate commerce.
 

 The effect of these two cases is to declare that the provisions in the federal Constitution giving to Congress the right to regulate commerce between the states is self-executing. There can be nothing shocking about this conclusion, because the same principle was very clearly declared by Mr. Justice Hughes in the
 
 Minnesota Rate Cases,
 
 230 U. S., 352, 33 S. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18. At page 399 (33 S. Ct., 740) of the opinion there is an elaborate discussion of this point, from which we quote:
 

 “The grant in the constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial inter
 
 *573
 
 course from the direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation.”
 

 Justice Hughes then proceeds to point out some of the matters which are beyond the power of interference on the part of the state, viz: To tax interstate commerce; to prohibit interstate trade in legitimate articles of commerce; to discriminate against the products of other states; to exclude from the limits of the state corporations or others engaged in interstate commerce, or to fetter by conditions their right to carry it on; and to prescribe the rates to be charged for transportation from one state to another, or to subject the operations of carriers in the course of such transportation to requirements that are unreasonable or pass beyond the bounds of suitable local protection. Numerous decisions of the United States Supreme Court are cited in support of each of these several prohibitions. The opinion then proceeds to discuss the things a state may do within the reserved powers of the Tenth Amendment to the federal Constitution. Among these are enumerated the
 
 *574
 
 right of pilotage in navigation; the right to protect its coasts and to improve its harbors, bays, and streams, unless there is conflict with some act of Congress; the right to regulate wharfage charges and exact tolls for the use of artificial facilities provided under its authority; to impose charter regulations not in conflict with federal action; to take steps to prevent the introduction or spread of disease, although interstate and foreign commerce are involved; to enact inspection laws and statutes designed to safeguard the inhabitants of a state from fraud and imposition; to penalize the possession of game during the closed season, whether obtained within the state or brought from abroad, in order to protect its game and preserve a valuable food supply; to penalize and punish interstate carriers for nonfeasance and misfeasance within its limits; to provide damages for wrongful death against carriers engaged in interstate commerce, where the wrong occurs within the jurisdiction of the state; to create and enforce liens upon vessels for supplies furnished under contracts not maritime in their nature; to create liens for damages to property on land occasioned by negligence of vessels; to seize cars employed in interstate commerce by attachment under state laws to compel the payments of debts; to enact laws safeguarding life and property and promoting comfort and convenience within its jurisdiction; to forbid the consolidation of state railroad corporations with competing lines, though both may be interstate, carriers. All such rights conceded to the states must, of course, necessarily be subject to any valid laws of Congress in conflict therewith.
 
 *575
 
 Decisions of the United States Supreme Court are also cited in support of each of these conceded powers reserved to the states.
 

 That case did not, of course, discuss the reserved powers of the state in matters of motor transportation, because that character of interstate commerce was at that time unknown. There are, however, later decisions of the United 'States Supreme Court which throw some light upon that question.
 

 The case of
 
 Hendrick
 
 v.
 
 Maryland,
 
 235 U. S., 610, 35 S. Ct., 140, 59 L. Ed., 385, involved the motor vehicle law of Maryland; the controversy involving an alleged discrimination against residents of the District of Columbia. Hendrick, a resident of the District, was prosecuted for a violation of the laws of Maryland, and upon appeal to the United States Supreme Court a conviction was affirmed. In the course of the opinion, at page 622 (35 S. Ct., 142), Mr. Justice McReynolds states:
 

 “In the absence of national legislation covering the subject, a state may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles — those moving in interstate commerce as well as others. And to this end it may require the registration of such vehicles and the licensing of their drivers, charging therefor reasonable fees graduated according to the horse power of the engines — a practical measure of size, speed, and difficulty of control. This is but an exercise of the police power uniformly recognized as belonging to the states and essential to the ■preservation of the health, safety, and comfort of their citizens, and it does not constitute a direct
 
 *576
 
 and material burden on interstate commerce. Tbe reasonableness of the state’s action is always subject to inquiry in so far as it affects interstate commerce, and in that regard it is likewise subordinate to the will of Congress.”
 

 Many cases are cited in support of this text.
 

 On the same page we find the following:
 

 “A further evident purpose was to secure some compensation for the use of facilities provided at great cost from the class for whose needs they are essential and whose operations over them are peculiarly injurious.”
 

 And at page 623 (35 S. Ct., 142) we find:
 

 “In view of the many decisions of this court, there can be no serious doubt that where a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor. The amount of the charges and the method of collection are primarily for determination by the state itself; and so long as they are reasonable iyid are fixed according to some uniform, fair, and practical standard they constitute no burden on interstate commerce.”
 

 In
 
 Kane
 
 v.
 
 New Jersey, 2
 
 42 U. S., 160, 37 S. Ct., 30, 61 L. Ed., 222, a law of the state of New Jersey was involved, which imposed a registration fee upon motor vehicles as a condition to the use of the highways, applying to residents and nonresidents alike. Kane was convicted by the state authorities upon a charge of operating a vehicle in violation of this law, and upon review the Supreme Court of the United States affirmed the conviction, declaring 'that so long as the fee was not un
 
 *577
 
 reasonable in amount it was not a discrimination against the citizens of other states. That ca’se followed and approved the case of
 
 Hendrick
 
 v.
 
 Maryland, supra;
 
 the only difference between the two cases being that in the former case the nonresident had driven his automobile into the state, and in the latter case he had driven through the state.
 

 Other decisions of state courts have been cited and discussed in argument, but the question being purely a federal one, and the decisions of the Supreme Court of the United States already cited covering the points involved, it would not be profitable to discuss them. It will be found, however, that they are uniformly in favor of reasonable state regulation, and tend to establish the principle that motor transportation engaged in interstate commerce is subject to all regulations which do not impose unreasonable burdens upon interstate commerce. In the instant case the certificate of convenience and necessity which was granted by the Public Utilities Commission im: posed upon the party so certificated the usual regulations imposed upon all persons and firms engaged in intrastate commerce within the state, and protected the protestant against competition on the part of the person so certificated by denying the latter the right to receive passengers within the state of Ohio whose destination is some other point within the state.
 

 If this court should declare that the Public Utilities Commission of Ohio has no power whatever over motor transportation companies whose lines extend beyond the borders of the state, it
 
 *578
 
 would confuse, disrupt, and completely annul much of the authority of the Public Utilities Commission in regulating purely intrastate transportation. If such a rule should be declared, the majority of motor transportation companies would establish one terminus of their lines beyond the borders of the state and by such means escape altogether the regulatory provisions of Sections 614-86 to 614-102 of the General Code of Ohio, providing rates, taxes, license for drivers, establishment and regulation of routes, indemnity insurance, and other familiar regulations. Such rule would also result by analogy in taking away from municipalities those powers over motor transportation which have been recently conferred upon them by the amendments to Section 614-84, which became effective August 3, 1925, and by Section 614-86, which became effective June 14, 1925.
 

 The commission has followed a conservative course which is in harmony with the decisions of the United States Supreme Court, and its order will therefore be affirmed.
 

 Order affirmed,,
 

 Jones, Matthias, Day, Allen, Kinkade and Eobinson, JJ., concur.