Jones, J.
 

 This is the second appearance of plaintiff in error in this court. In the former case,
 
 Motor Freight, Inc.,
 
 v.
 
 Public Utilities Commission, 120
 
 Ohio St., 1, 165 N. E., 355, the majority of the court were of the opinion that the evidence therein adduced did not bring the respondent, Motor Freight, Inc., within the meaning of the term “motor transportation company,” as it was then defined in Section 614-84, General Code. While the character of the plaintiff in error’s business is, in the main, set forth in that case, there are now presented some additional facts which more clearly disclose its methods of operation.
 

 We have heretofore recognized the rule that private carriers operating over the highways of this state, for hire, are not subject to the law regulating the operation of motor vehicles under our Motor Transportation Act.
 
 Hissem
 
 v.
 
 Guran,
 
 112 Ohio St., 59, 146 N. E., 808. In the instant case the Public Utilities Commission, adhering to the principle announced in the Guran case, must have found from the evidence contained in the record that the plaintiff in error was engaged in serving the public, not as a private carrier, but as a common carrier; and, since the case turns upon that feature, it becomes necessary to examine the
 
 *351
 
 evidence in order to ascertain if the conclusion of the commission is well founded.
 

 Plaintiff in error is engaged in the business of interstate transportation of goods between Detroit, Michigan, and the cities of Cleveland and Akron, Ohio, and between those cities and points in southern states. The record discloses that the plaintiff in error was the owner of a few trailers, used in its operation, and that it had a terminal in the city of Cleveland, which it rented from month td month. It had agents located in that city and also in Akron. It has increased the number of trucks over the number employed by it at the first hearing of this case. It now employs about forty-five independent truck owners, who transport its freight, and it retains and exercises the power of discharging them for inadequate service. It has checking stations along its routes for registering the trucks, and, if there be a breakdown of equipment, it employs other truck owners- to pick up the freight and carry it to its destination. The record discloses that, while it has some twenty-five or twenty-six firms which it called “customers,” it was open to shipping engagements for hire with any other shipper who desired transportation. The earnings of the independent truck owners were based sometimes upon a flat price per one hundred pounds, or per ton, and sometimes upon a percentage of about 70 per cent, of their gross income. The service was rendered both upon a prepaid and collect requirement. It carried insurance on its freight shipments, and charged it to individual truck contractors. It appears that most of its contracts for shipment were verbal, and were made from time to time with shippers who sought its future service. It further appears that there were three written contracts, or memoranda, which plaintiff in error had for transportation, and these were indefinite as to time. That the plaintiff in error held itself open to serve the public generally is demonstrated by a sign
 
 *352
 
 at its Cleveland terminal reading: “Motor Freight, Inc., Daily Service between Detroit and Cleveland.” On the witness stand the secretary and treasurer of the company was asked how it was known when some company desired transportation services? He answered: “Through a man in Detroit representing the Hupp Motor.” “Q. Did you yourself negotiate them for that business? A. Partially, yes.” There is ample evidence that the plaintiff in error was not engaged merely in carrying out its existing contracts, but that it negotiated contracts from time to time with other shippers having goods for transportation. That it was open to future engagements with various shippers indiscriminately is shown by the secretary and treasurer’s testimony as follows: “Q. What would you say about prospective customers? A. We generally look into the property they might have
 
 to
 
 offer and we consider their movement of freight; if there is any money to be made we will enter into a contract with them and handle it for them.” When asked whether he felt obligated to accept freight that a shipper tendered to the company, he repeated that the company could turn it down if there was no money in it. The testimony as a whole supports the conclusion that the plaintiff in error not only advertised that daily service would be furnished, but that it negotiated carriage of freight from any of the public who had goods to ship, and accepted it if the remuneration was sufficient.
 

 This case is not dissimilar from the following cases, distinguishing the characteristics of private and common carriers:
 
 Craig
 
 v.
 
 Public Utilities Commission,
 
 115 Ohio St., 512, 154 N. E., 795;
 
 Breuer
 
 v.
 
 Public Utilities Commission,
 
 118 Ohio St., 96, 160 N. E., 623. In the
 
 Craig case, supra,
 
 Craig advertised: “Local and Long distance hauling.” He hauled partly for himself, and part of the time hauled for others for hire. Se testified that he would haul for anybody that would
 
 *353
 
 come to him, if he were not too busy and he could agree on a price. The court held that Craig was a common carrier. More in point is the
 
 Breuer case, supra.
 
 Breuer served only patrons who entered into a contract with him. He also advertised local and long distance trucking, and employed a solicitor to secure business. His testimony was very similar to that elicited in the instant case. He testified that he would haul for any one who would sign a contract, holding himself out to serve the public indifferently; “his only condition being that their credit standing was to be satisfactory.” His contract, on its face, was termed a private contract, but he held himself, as in this case, in readiness to transport merchandise for any patron who would sign such contract if his credit standing was satisfactory. Breuer was held to be a common carrier.
 

 The various distinguishing features in this case, which indicate the public nature of its business, are entirely dissimilar from those presented in the two following federal cases.
 
 Michigan Public Utilities Commission
 
 v.
 
 Duke,
 
 266 U. S., 570, 45 S. Ct., 191, 69 L. Ed., 445, 36 A. L. R., 1105;
 
 Frost & Frost Trucking Co.
 
 v.
 
 Railroad Commission of Cal.,
 
 271 U. S., 583, 46 S. Ct., 605, 70 L. Ed., 1101, 47 A. L. R., 457. In the
 
 Duke case
 
 the plaintiff seems to have had but three contracts, with three manufacturers of goods. The opinion states that “he had no other business and did not hold himself out as a carrier for the public. * * * His sole business is interstate commerce, and it is limited to the transportation covered by his three contracts.” In the
 
 Frost & Frost Trucking case, supra,
 
 the opinion, on page 590 of 271 U. S., 46 S. Ct., 606, recites that the plaintiffs in error “were engaged under a single private contract in transporting, for stipulated compensation, citrous fruit over the public highways between fixed termini. ’ ’ And in closing his opinion Mr. Justice Sutherland said: “The court be
 
 *354
 
 low seemed to think that, if the state may not subject the plaintiffs in error to the provisions of the act in respect of common carriers, it will be within the power of any carrier, by the simple device of making private contracts to an unlimited number, to secure all the privileges afforded common carriers without assuming any of their duties or obligations. It is enough to say that no such case is presented here; and we are not to be understood as challenging the power of the state, or of the railroad commission under the present statute, whenever it shall appear that a carrier, posing as a private carrier, is in substance and reality a common carrier, to so declare and regulate his or its operations accordingly.” "We now have that supposititious case.
 

 "When we consider all the
 
 indicia
 
 surrounding the operations of this plaintiff in error, including its mode of advertisement, its negotiations with prospective customers, its holding itself ready to take future contracts of carriage and entering into such contracts when the emoluments are adequate, we are of the opinion that the commission rightly came to the conclusion that the plaintiff in error cannot pose as a private carrier by the simple device of making and accepting what it terms private contracts with an unlimited number of future shippers, and thereby secure the privileges accorded common carriers without assuming any of their duties or obligations. If intrastate operators were to employ similar methods of doing business, and thus evade the responsibilities that common carriers generally assume, the field of motor regulation by the Public Utilities Commission would be extremely limited. The plaintiff in error has increased the number of its contract truck operators since the case was first heard, and, if its business warrants, could by the method employed by it increase the number of its operators
 
 ad libitum,
 
 and could, if its contention were upheld, burden the highways of the
 
 *355
 
 state without assuming the responsibilities of a common carrier and without supervision by the state Public Utilities Commission; if this were permitted, intrastate operators could likewise place themselves in the category of private carriers.
 

 Since the plaintiff in error is an interstate operator, the commission does not require it to furnish proof of convenience and necessity for its operations over the highways of the state, as in the case of an intrastate operator; nor does it seek to exclude it from operating over the state highways. It requires only that it shall comply with the state Motor Act, by obtaining a certificate from the commission upon regulatory conditions which may be constitutionally imposed by the state. There is here presented no question of the prohibition of the use of the state highways, but only the attempt by the Public Utilities Commission to require the plaintiff in error to register subject to the lawful conditions which may be imposed.
 
 Buck
 
 v.
 
 Kuykendall, Dir. of Pub. Works,
 
 267 U. S., 307, 45 S. Ct., 324, 69 L. Ed., 623, 38 A. L. R., 286;
 
 Michigan Public Utilities Commission
 
 v.
 
 Duke, supra.
 
 In the
 
 Duke case,
 
 Mr. Justice Butler said: “This Court has held that, in the absence of national legislation covering the subject, a State may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles — those moving in interstate commerce as well as otherwise; that a reasonable, graduated license fee imposed by a State on motor vehicles used in interstate commerce does not constitute a direct burden on interstate commerce, and that a State, which, at its own expense, furnishes special facilities for the use of those engaged in intrastate and interstate commerce may exact compensation therefor, and if the charges are reasonable and uniform, they constitute no burden on interstate commerce.” To the same effect are the following Ohio cases:
 
 Cannon Ball
 
 
 *356
 

 Transportation Co.
 
 v.
 
 Public Utilities Commission,
 
 113 Ohio St., 565, 149 N. E., 713;
 
 Erie Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 123 Ohio St., 682, 177 N. E., 766. These cases dispose of the constitutional questions argued by counsel for plaintiff in error. The plaintiff in error places some reliance1 on the claim that undue tax burdens will be placed upon interstate operators. Under the Ohio Motor Act, taxes levied for motor transportation are used for the expense of its administration, and for the maintenance and repairs of state highways. Section 614-94, General Code. Where such taxes are not privilege taxes, when they are reasonable and not discriminatory, and are levied as compensation for the use of the state highways, and for defraying expenses of motor traffic, their imposition does not violate the provisions of the Federal Constitution.
 
 Interstate Transit, Inc.,
 
 v.
 
 Lindsey, Clerk,
 
 283 U. S., 183, 51 S. Ct., 380, 75 L. Ed., 953.
 

 The plaintiff in error declines to apply for a certificate and does not acknowledge any supervision by the state commission. It cannot assume, in advance, that the Public Utilities Commission will impose unconstitutional conditions or burdens upon it; it will be presumed, rather, that it will obey the mandate of the statute (Section 614-101, General Code), which provides that the provisions of the Motor Act shall not apply to commerce among the several states “except in so far as the same may be permitted under the provisions of the constitution of the United States and the acts of congress.”
 

 Since our former decision relating to this company (120 Ohio State, 1), Sections 614-2 and 614-84, General Code (111 Ohio Laws, 512), which were then under consideration, have been substantially amended (113 Ohio Laws, 482). At the time the present citation was issued, Section 614-2, as amended in 113 Ohio Laws, 482, 483, provided that any person, firm or cor
 
 *357
 
 poration, “when engaged in the business of carrying and transporting persons or property, or both,
 
 or of providing or furnishing such transportation service, * * *
 
 for hire, in
 
 or by
 
 motor propelled vehicles of any kind whatsoever * * *
 
 including trailers
 
 for the public in general, over any public street, road or highway in this state, except as otherwise provided in Section 614-84, is a motor transportation company.”
 

 At the same time Section 614-84, General Code, was also amended (113 Ohio Laws, 484), and now reads as follows: “The term ‘motor transportation company,’ when used in this chapter, * * *
 
 shall include, and all provisions of la/w regulating the business of motor transportation, the context thereof notwithstanding, shall apply to,
 
 every corporation, company, association, joint stock association, person, firm or co-partnership, their lessees, trustees, receivers or trustees appointed by any court whatsoever,
 
 when engaged
 
 * * * in the business of * * *
 
 transporting
 
 persons or property, or both * * *
 
 or of providing or furnishing such transportation service,
 
 for hire, * * * for the public in general,
 
 in or by motor propelled vehicles of any hind whatsoever, including trailers,
 
 over any public highway in this state.” (The italicized clauses in the two sections were not in the earlier statutes.)
 

 This court, in the
 
 Motor Freight, Inc., case, supra,
 
 held that the company was immune from registering under the Ohio law as it then stood. That decision was rendered February 13, 1929. The amended sections quoted above were passed by the General Assembly April 6, 1929, effective July 23, 1929. The italicized portions in the amended act do not appear in the original act, and we can safely assume that the Legislature, in view of our former decision in the
 
 Motor Freight, Inc., case,
 
 amended the two sections of the Transportation Act defining a “motor transportation company” so as to apply to any person, firm or
 
 *358
 
 corporation that is engaged in the business
 
 “of providing or furnishing such transportation service for hire.”
 

 This record clearly shows that, although plaintiff in error claims to be engaged in the business of what is denominated “brokering” its various shipments, it is in reality furnishing transportation for hire within the purview of the amended statute. It provides or furnishes this transportation for hire over the public highways of the state for the public in general; that is to say, it furnishes shipping service to any person who may desire it, and this it does both under written or oral contracts, but mostly oral. Had the truck owners themselves adopted the same method of obtaining and doing business, and had they been similarly engaged in transporting between intrastate termini, they would undoubtedly be amenable to the provisions of the Motor Transportation Act requiring a certificate for such purpose.
 

 While this exact question was not before this court in
 
 Larkin
 
 v.
 
 Public Utilities Commission,
 
 124 Ohio St., 554, 180 N. E., 54, the principle there announced is analogous. That case involved an intrastate transaction, where the owner of a motor freight terminal made contracts for hire for trans-shipment and the routing of property from its terminal to other points. The owner applied for a certificate of convenience and necessity for such operation. This court held that under the recently amended Section 614-84, General Code, Larkin, the applicant for a certificate was engaged in the business of providing and furnishing transportation service for hire, and affirmed the commission, which had denied Larkin the certificate. Furthermore,' the operation carried on in the
 
 Larkin case
 
 was very similar to this. In the course of the opinion, dwelling especially upon the recently amended provisions contained in Section 614-84, this was said: “Obviously, therefore, the Legislature amended the
 
 *359
 
 statute to take care of the precise situation which, existed when this court held that
 
 Motor Freight, Inc.,
 
 did not come within the purview of the statutes.”
 

 Since the method of operation by Motor Freight, Inc., was found by the commission to be such as to constitute the plaintiff in error a common carrier, and a motor transportation company within the purview of the amended statutes, we will not disturb its finding in that respect. The order of the Public Utilities Commission is not unreasonable, nor unlawful, and it is therefore affirmed.
 

 Order affirmed.
 

 Marshall, C. J., Matthias, Day, Allen, Kinkade and Stephenson, JJ., concur.