HAZARD *v.* GREAT CENTRAL TRANSPORT CORP.

KISER *v.* SAME.

PATERSON *v.* SAME.

GOODRUM *v.* SAME.

1. AUTOMOBILES — MOTOR FREIGHT CARRIER — TRUCKER — QUESTIONS FOR JURY.

In action for damages for personal injuries against defendant, an interstate motor freight carrier, employment of owner and operator of truck involved in accident and control exercised over his activities in and about defendant's business were issues of fact for jury.

2. SAME—MASTER AND SERVANT—RESPONDEAT SUPERIOR—EVIDENCE.

Finding of jury that relation of master and servant existed between defendant interstate motor freight carrier and owner and operator of truck involved in accident with plaintiffs, so as to render it liable for trucker's negligence under rule of *respondeat superior, held,* supported by evidence.

3. SAME—LIABILITY OF CARRIER FOR TRUCKER'S NEGLIGENCE.

Liability of defendant interstate motor freight carrier to third parties for negligence of truck owner and operator it hired to carry its freight is determined by the factual relations between trucker and carrier regardless of provisions of so-called contract not signed by latter.

4. TORTS—LAW OF PLACE OF INJURY GOVERNS.

Liability for tort is determined by the law of the place of injury.

5. AUTOMOBILES—LIABILITY OF INTERSTATE MOTOR FREIGHT CARRIER AS COMMON CARRIER IN OHIO.

Evidence, in action for damages for personal injuries sustained in accident in Ohio between plaintiffs and trucker for defendant interstate motor freight carrier, *held,* sufficient to enable jury to find defendant a common carrier in Ohio which could not delegate its duties and was liable for negligence of persons performing its duties within scope of their employment.

6. TRIAL—GENERAL VERDICT—MASTER AND SERVANT—INDEPENDENT
   CONTRACTOR.

   General verdict for plaintiffs in their action for damages for per-
      sonal injuries received in accident in Ohio with defendant inter-
      state motor freight carrier's trucker *held,* sufficient and valid,
      where no special questions were submitted, to hold defendant
      under either theory that relation between defendant and its
      trucker was that of master and servant or that trucker was an
      independent contractor in Michigan and defendant liable as
      common carrier in Ohio for trucker's negligence.

Appeal from Wayne; Chenot (James E.), J. Sub-
mitted October 10, 1934.   (Docket No. 9, Calendar
No. 37,809.)   Decided January 7, 1935.

Five separate actions of case, two by Lottie Lee
Hazard, as administratrix of the estate of James H.
Outen, Jr., deceased, and one each by William W.
Kiser, William Paterson, and Edward Goodrum,
against Great Central Transport Corporation, a
Michigan corporation, for damages resulting from
a motor vehicle accident in Ohio.   Verdict and judg-
ment for plaintiff Hazard in two cases consolidated
for trial.   Judgment for plaintiffs Kiser, Paterson,
and Goodrum in cases consolidated and tried with-
out a jury.   Defendant appeals.   Cases consolidated
for appeal.   Affirmed.

*Butzel, Levin & Winston (George A. Cheney* and
*Chris M. Youngjohn,* of counsel), for plaintiffs.

*Stevenson, Butzel, Eaman & Long (Leo W. Kuhn*
and *Richard H. Hecker,* of counsel), for defendant.

WIEST, J.   Defendant is a Michigan corporation,
engaged in transporting merchandise and freight
for hire, under contracts with shippers, from the
city of Detroit to points in Ohio and elsewhere.

In 1930, having no trucks of its own, it engaged the services of other truck owners in carrying on its transportation business and facilities. To this end it engaged Herbert Bradley and Frank Ashby, together with their truck, to pick up freight in Detroit, from contract shippers, and carry the same to such points as it designated, either in routing, change *en route* or upon arrival at point first designated. In August, 1930, Mr. Bradley, under direction of defendant, went with his truck to several places in Detroit and picked up articles of merchandise and freight defendant had contracted to transport, and the load was routed by defendant to its terminal in Cincinnati, Ohio, but with further possible direction upon reaching that place. On the way to Cincinnati, and near Bowling Green, Ohio, and in the nighttime, it is claimed that Bradley, in driving the truck, "hogged" the road and caused a collision with a Ford automobile, throwing the Ford automobile onto the hood of another automobile following the truck, resulting in a fire of the Ford automobile, fatal injuries to James H. Outen, Jr., a passenger in the Ford car, and serious injuries to William W. Kiser, William Paterson and Edward Goodrum, who were in the car following the truck.

Five suits were brought against the transport company, two by the administratrix of the estate of the deceased; in one to recover damages under the death act (3 Comp. Laws 1929, § 14061 *et seq.*), and the other in behalf of the parents of the deceased, and separate suits by the other three injured persons were also brought. The two suits brought by the administratrix were tried together and resulted in verdicts against defendant. Thereupon the suits by Kiser, Paterson and Goodrum were sub-

mitted to the court, mainly upon the evidence in the former cases, and judgments rendered against defendant.

The amounts of the judgments are not questioned. The negligence of Bradley is no longer made an issue. Upon appeal it is contended, in behalf of defendant, that Bradley was an independent contractor and defendant cannot be held liable to respond for his negligence. Counsel for plaintiffs contend that the relation between defendant and Bradley was that of employer and employee; that Bradley was not an independent contractor but, even if such in Michigan, then, under the law of Ohio, the place of the accident, defendant was there a common carrier, and its obligations and liability were nondelegable. The above states the pivotal issues.

If the relation of master and servant obtain between Bradley and the transport company, then defendant is liable regardless of the question of its being a common carrier, under the law of Ohio. The employment of Bradley in Michigan, together with the purpose thereof, acts directed by defendant and performed by Bradley, and the control reserved and exercised over his activities in and about the business of defendant were issues of fact for the jury, and so left by the trial judge, under the following instructions, after stating the claims of the parties:

"It is for you to say what the relationship was, if any existed between Bradley and the defendant transport corporation, and the burden of proof is on the plaintiff to prove the existence of the relationship, whatever it was.   *   *   *

"Now, then, as to what the relationship was between Bradley and the defendant corporation,

transport corporation, if any relationship existed, on that subject the law of the State of Michigan will govern.

"Now, members of the jury, what is an independent contractor, and what is meant by the relationship of master and servant or employee? Where the person whose negligence has caused the injury, has contracted only for results and is independent and free from direction or restraint in the performance of his obligation, he is an independent contractor. In cases where the essential object of an agreement is the performance of the work, the relation of master and servant will not be predicated as between the party for whose benefit the work is to be done and the party who is to do the work, unless the former has retained the right to exercise control over the latter in respect to the manner in which the work is to be executed.

"A servant is a person subject to the command of his master as to the manner in which he shall do his work. The relation of master and servant exists where the master cannot only order the work but how it shall be done. When the person to do the work may do it as he pleases, then such person is not a servant."

The carriage was not casual but in the course of defendant's business and contemplated continuing service by Bradley. Defendant engaged to carry for others, under contract, and, in order to comply, hired Bradley and his truck. Mr. Bradley testified:

"I was told where to pick up the stuff that I had on that contract by the man at the Great Central, the man that I had been having dealings with. I did not pick up all the stuff at the Great Central's depot, I went other places after being told to go there by this man. After I picked that up I came back to the Great Central.

"Then they told me to go down to Cincinnati. I had some stuff to go to Covington, Kentucky, I

think.  They told me where to go in Cincinnati.
It was on Third I think.  That is the company's
docks in Cincinnati.

"From there I was going down to Covington,
Kentucky, if they wanted me to go.  It was up to
the Cincinnati office as to whether I would go to*
Covington.   *   *   *

"The Great Central did not tell me how much to
put on but they told me to go and pick up this load
at the American Brass.  The American Brass was
the last place I went to.  First was the Budd Wheel.
They told me to go there and pick up some rims
and wheels, then I went to the Woodall Industries.
I think that was it.  They told me where to go and
what to pick up.  I don't remember whether I went
to the Detroit Sulphite Pulp & Paper Company or
not and I don't remember going to the Hy-Grade
Food Company.  I do remember them telling me to
go to the American Brass.  They said they had some
freight there.   *   *   *

"They told me to go to that other freight ware-
house in Cincinnati, and if they said so, take this
freight on to Covington, if there was a different des-
tination for it, they did not tell me how to get there
or anything else."

James B. Godfrey, Jr., president of defendant
corporation in August, 1930, testified that the arti-
cles of incorporation stated the purpose of the
corporation to be:

" 'To operate a motor transport line by the use
of motor trucks, trailers and tractors, for the pur-
pose of transporting general merchandise, to own
or lease real estate or equipment ordinarily re-
quired in the conduct of such a business, and to do
any and all things incident thereto.'   *   *   *

"In the month of August, 1930, it owned no
trucks, trailers or tractors which were being used
in interstate transportation business.   *   *   *   In
1930 in August the company did not own any trucks

which were used in what is generally known as intrastate transportation. We owned two trucks in August, 1930. We used them for picking up freight and delivery work in cities, but it did not go outside of the city limits.   *   *   *

"When we used a truck for pick-up, either in the city of Detroit or in the city of Cincinnati, it would go, say, out to a factory and pick up some merchandise and bring it to the terminal, or *vice versa.*   *   *   *

"We did go out to such firms as we felt had business that we could handle properly.   *   *   *  And this was true in 1930.   *   *   *

"We were endeavoring to move freight daily during that period of time. Without introducing all of our records I could not say whether we did or not. We endeavored, as the advertisement says, to serve the great central market, and the great central market is that area of Michigan, Ohio, Indiana, Illinois and reaching down into Covington, Kentucky.   *   *   *

"All of the merchandise that we were handling for our various shipper customers or the people who wanted to transport merchandise by our route, was moved by motor truck.   *   *   *

"We would contract for the services of a truck or trailer as the case may be, or both, and that was the case in 1928, and continuing right down to the present day with a few exceptions, over a period of about four months from August, 1929, to about January, 1930.   *   *   *

"Yes, the corporation had a written agreement. I have a copy of it. It is a carbon copy. It is a carbon copy signed in the hand of Bradley. It is not signed by the Great Central Transport Corporation. Exhibit 7 is the paper or contract I had reference to. We had no written contract other than exhibit 7 with Mr. Bradley, to the best of my knowledge."

After the accident the witness went to Bowling Green and arranged to keep the load *en route.* At the time of. the accident the defendant employed about 15 trucks. He further testified:

"We would have a general understanding with them (shippers) that we would haul for that shipper as well as a number of others that I have mentioned as, if 'and when they tendered to us the freight and tendered us the payment for it. We solicited our shipments or our business from the better class of shippers in Detroit and the various terminal cities where we operated. * * *

"Our billings contain the name of the consignor, and the address of the consignee, and the merchandise that is on that billing, and when the address of the consignee is known, the place of delivery is also known, but they are quite often diverted in transit, and the billing will not necessarily so show. The diversion may take place long after the bill is made. The instructions or the information as to diversion in transit would come from our office to the truck owner. In case of serious accident or unreasonable delay, the truck owner was .to report to the company immediately, and then the Great Central Transport Corporation would make arrangements for relief if it was necessary, as was done in this particular case. * * *

"Ashby and Bradley or any other trucker would know where to go for merchandise pick-ups. They would be told by our office, and would be instructed by some one in our office, either the dispatcher, or another agent or an officer of the company what factory to go to to get the merchandise, and then if there was not enough there for a load he might be sent direct from that factory, or he might be sent back to the terminal, and then at the terminal the driver gets this truck tonnage sheet, if there are pick-ups at the terminal, and goes on his way.

None of the contract owners and drivers have any supervision or control or management of our terminals.''

We think the evidence supported the finding of the jury that the relation between defendant and Bradley was that of master and servant. Such being the relation, the liability of defendant, for the negligence of Bradley, in the course of his employment, bringing injury to third parties, falls within the rule of *respondeat superior*. But defendant points to the so-called written contract, signed by Bradley.

The contract is too long to be inserted. Briefly stated it provided that, for a term of 12 months, Bradley and Ashby, as contractors, and not as employees, should perform with their truck all such trucking, hauling and delivering, as might be furnished by the company, to all points or destinations necessary; the company to carry property damage, public liability and compensation insurance under its so-called ''fleet policy,'' and to insure freight in course of transportation; the company to have right to the services as needed; the contractors to abide by all the rules of operation and to maintain all schedules issued by the company and use their best efforts and endeavors in the promotion of the business of the company, but—

''This provision is not intended to dictate, control, regulate or otherwise direct the manner in which the contractor shall perform this contract, nor to place the contractor in the category of an employee, but simply to make uniform the procedure of the various contractors performing similar services for the company.''

The contractor was to collect c. o. d. freight charges, and compensation was fixed by percentage

on freight charges received by the company on hauls made by the contractors.

This contract provided that it should not become binding or valid upon the company unless signed by an authorized representative of the company and approved by the president thereof. It was not so signed or approved.

The circuit judge, while holding it was not a contract, instructed the jury to consider the contents thereof, together with all other evidence in the case, in determining the question of what the relation was between the defendant and Bradley.

In any event defendant's liability to third parties is not solely determined by any provision in the so-called contract. The factual relations between the company and Bradley control, regardless of the provisions in the so-called contract.

Under Ohio law was defendant a common carrier and, as such, barred from delegating any of its obligations and responsibilities to an independent contractor? It is well settled that liability for a tort is determined by the law of the place of injury. *Young* v. *Masci,* 289 U. S. 253 (53 Sup. Ct. 599, 88 A. L. R. 170).

The trial judge instructed the jury:

"I charge you, members of the jury, that under the law of the State of Ohio, a common carrier is one who undertakes for hire or reward, to carry or cause to be carried from one place to another, goods for all persons indifferently who may choose to employ him and who holds himself out to the public as being willing to serve the public indifferently to the limit of his capacity.

"I charge you further that a carrier is not bound to carry for every person tendering goods of any description but its obligation is to carry according to its public profession. As otherwise expressed, a

common carrier may hold itself out to the public as being a carrier of specified articles only, and, if it is engaged only in the carriage of such articles, it is under no obligation to carry other things. Also it may hold itself out as a carrier of freight generally prepared for carriage in a particular way, in which case it will not be bound to carry except to the extent and in the manner proposed.

"I charge you further that to constitute one a common carrier, it is not essential that the person or corporation, charged as such, should own the means of transportation.

"I charge you further that it is a question of fact, to be determined by you members of the jury, whether the defendant in each of these cases was, on August 2, 1930, a common carrier within the definition of a common carrier which I have already given you.

"I charge you that it is the law of the State of Ohio, where the accident happened, that a corporation which is engaged as a common carrier of freight by motor truck and which holds itself out as such to the public, cannot delegate the carriage of goods on public highways to a third party so as to relieve itself of liability for negligent acts committed in performance of its duties as such common carrier. Under the law of Ohio the duties of a common carrier are nondelegable, and it is answerable for negligence of persons to whom it entrusts performance of part of its duties, if acts are done in performance of such duties while acting within the scope of agreement of carriage."

The instruction, with reference to common carriers, was in accord with the law of Ohio, found in General Code § 614–84 as amended by 113 Ohio Laws, p. 484 (1929), and construed in *Motor Freight, Inc.*, v. *Public Utilities Commission of Ohio*, 125 Ohio St. 349 (181 N. E. 479), and with

reference to nondelegable power, as held in *Interstate Motor Freight Corp.* v. *Beecher,* 37 Ohio App. 23 (174 N. E. 27).

There was evidence from which the jury could find the essential facts constituting defendant a common carrier in the State of Ohio.

The verdict was general. No special questions were submitted. If the jury found the relation of master and servant then defendant was liable. If the jury found the relation of independent contractor on the part of Bradley in Michigan, and that in Ohio defendant was a common carrier, then, the accident having occurred in Ohio, the law of that State governs and, for a tort committed by Bradley, defendant cannot escape liability under the claim that Bradley was an independent contractor. The general verdict, therefore, was sufficient and valid.

Other points relative to rulings upon the trial have been considered and found not to command reversal.

The judgments are affirmed, with costs to plaintiffs.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred. BUTZEL, J., did not sit.